Our first cases this morning are PANDUIT with ADC and REA. Separate cases, we put them together for argument. Mr. Collier, I guess you'll be going for 20 minutes, and then we'll hear from Mr. Stewart for 20 minutes, and then Mr. Casper, is that right? Mr. Stewart, have I got Ms. Casper's, have I? Ms. Casper I believe you're on the CTO, CTO, I'm going to go third. Mr. Stewart You're third. All right. Then first will be Mr. Casper's. Mr. Casper Collier. Mr. Stewart Okay. I think we have it now then, Mr. Collier. You start first then, thank you. Mr. Collier I would like to reserve confidence for Obama. Mr. Stewart Please. Mr. Casper May it please the court. There's two issues that I would like to discuss today. Mr. Stewart Two out of 32, or how many did you throw at us? Mr. Casper I'm not sure of the exact number. Mr. Stewart I'm not either. Please proceed. Mr. Casper The board's treatment is a long reference, and the board's refusal to consider the examiner's failure to adopt PANDUIT challenges to ADC's claims that were added during re-examination. Mr. Stewart Well let me get right to the board's refusal. Wasn't that issue petitionable and you didn't petition? Mr. Casper It's not clear that the issue was petitionable. There's nothing in Mr. Stewart It's procedure. It's a failure to examine. It's not the substance of a rejection. Mr. Casper Well the challenges were presented and the examiner did not adopt them, and that is a decision favorable to PANDABILITY that falls under the statute and the rules that govern the issues that are reviewable on appeal. Mr. Casper Both the statute and the rules do not specify that challenges have to be framed in the form of proposed rejections. Mr. Casper They specifically mention the broader language that is some kind of decision favorable to PANDABILITY. Mr. Stewart This issue is common to both appeals. Mr. Casper Yes. The statute and the rule simply state that a decision favorable to PANDABILITY is appealable. Mr. Stewart The decision not to examine because it wasn't presented fully as a proposed rejection with claims applied to prior art, that is a procedural point rather than a substantive rejection. Mr. Casper The challenges weren't considered and that is a decision that is favorable to PANDABILITY. The challenges were presented where we addressed each feature added in the additional claims, pointed to where they were in the prior art, and the examiner even adopted some rejections that were exactly the same as those challenges. Mr. Stewart So what are you raising this further issue for? If the examiner adopted certain rejections similar to what they said they wouldn't do? Mr. Stewart There were ones that he didn't adopt that we believe he should have. If they were considered, his decision not to adopt them was a decision that was favorable to PANDABILITY under the statute, under the rule, it's reviewable on appeal. Mr. Stewart There's nothing that says in the MPP or in any guidance specifically that that's a petitionable issue. And the fact of the matter is to have required us to file a petition on an issue where it's not specific that we should have filed a petition and deny us review of these rejections is going to prevent us because if we stop or get attached to the procedure from ever addressing those claims subsequently. Audience Member Can I just turn into a logistical question because we've got so many claims here. On the first case, now your friend on the other side is cross appealing the rejection under anticipation by Staber of certain of the claims. But if hypothetically we were to agree with him, doesn't that dispose of at least a large number of your appealable issues? Mr. Stewart I mean it goes through, as I understand that one, that anticipation rejection goes to claims 1 through 9, 12 and 13. And it seems like there's a lot of overlap between those and the ones you were challenging on your appeal. Mr. Stewart There is some overlap certainly. There are issues that don't overlap and particularly the board's reversal of the examiner's rejection over long view of Staber in the first case that has resulted in some a lot of claims that I would like to address right now. Mr. Stewart For that rejection, the board on its own construed the term cable exit trough to require a long, narrow, open receptacle. Based on the definition that the board obtained on its own from a general purpose petition area that relates to animal feed troughs, we feel like that definition is narrower than the broadest reasonable construction, which is the standard that controls during reexamination. Specifically because it's inconsistent with more relevant technical definitions that apply to the term cable trough, which is really what we're dealing with here. It's also inconsistent with the disclosure of ABC's patent. The McGraw-Hill Dictionary of Scientific and Technical Terms defines a cable trough as an enclosed channel, usually beneath the floor, that provides a path for cables. That definition alone establishes that the term trough is broad enough to encompass both open and enclosed structures. So the board's limiting that term to only open long and narrow structures is narrower than the broadest reasonable interpretation and view of the specification. Furthermore, if you were to look at the embodiment in ABC's patents, the cable exit troughs in all of the embodiments, 100 and 200, I don't think anybody would view those as being long and narrow. They're very unique structures. So what are you proposing as the alternative claim construction? It's structure that provides a pathway that allows cables to exit a trough. So even though there's no opening at all on any side, completely enclosed? Well, turning to long, there is an opening. The part of long that the cables travel through to exit the trough is referred to as the funnel-shaped part 5. Consistently throughout the long reference, funnel-shaped part. Funnels have openings. Just looking at long, the board says it's enclosed on all four sides. So we're looking at the opening on the four sides, right? The board actually said that the funnel-shaped part would be understood to be a tube or a shaft on page A88 of the appendix. In their decision, they said that it would be understood to be a tube or a shaft, and thus it's enclosed. So they were not saying that it was enclosed on all sides. They were saying that it was enclosed as a tube or a shaft. If you look at figure 2 of long, you can see the cables exiting the funnel-shaped one. There is an opening that those cables are coming out of. If it were completely enclosed, the cables couldn't travel through it. The board held that claims 1 to 8 and 11 were obvious over Staber and Scheuermann and Meyerhofer, right? I believe that's correct. And you're claiming the board erred in not adopting their projections to claims 1 to 8 because Scheuermann, Henneberger and Meyerhofer were deficient. There's seemingly inconsistency here. You argue that these references failed to disclose a vertical downspout. Well, I guess the board held that they failed to disclose a vertical downspout portion. That's correct. But they rejected them for the same references. Yes, in a different part. Straighten that out for us. Well, I think that was an inconsistency in the board's opinion. But you're in opposition to these patents. You're trying to wrap their knuckles to make sure they're absolutely inconsistent. You want these claims knocked out, which they did. So it seems as though you're sort of nitpicking them for the way they did it, but you got what you wanted. The claims were rejected, 1 to 8 and 11. That's correct. We are entitled to fallback positions in case those projections that stand are determined to not be good. Because of this proceeding, we have to raise all of our challenges due to the estoppel procedures. That is why we are proposing alternative projections. With that, I believe I've addressed my two issues. I'd like to reserve the remainder of the time to go back. Thank you. Thank you. May it please the court, I've reserved four minutes for rebuttal. I'm going to address two claims. Claim 1 of the 625 and Claim 14 of the 220. Claim 1 of the 625 was rejected as obvious, using Stavert as the primary reference. The board found that it would have been obvious to modify Stavert's bridge to include the missing elements of the 625 patent claim 1. I'm going to address three of those missing elements. The two curved sidewalls, the vertical downspout, and the language that says, when mounted to the lateral trough, the cable exit pathway extends transversely over the top edge of the sidewall. Well, it looks to me like Scheunen is a better reference. But Scheunen goes right through instead of over. It goes right through. That's exactly right. Obviously, not to coin a phrase, but it obviously would seem to be a better primary reference. But it depicts the problem with the prior art. They're going through the wall. They're taking a more direct path versus what we did. We took the indirect path, routing it initially in the opposite direction from the end destination. But ultimately, it goes down, doesn't it? Ultimately, it goes down. Wasn't it obvious in view of the other references, which do all sorts of similar things, to go over it, not through it? No, I don't believe so, Your Honor. No. If you look at Staber, what it discloses, we've got it on page 19 of our brief. I've shown figure 3 and figure 1. It takes a single cable over a vertically running flange, and it has two straight parallel sidewalls on the top end and on the bottom end. They're symmetrical, mirror images of each other. And that pathway, to prevent overbending, it's aimed, pointed at an acute angle. For example, to take the cable that's descending downward over the edge. So, again, it results in a small acute angle to take it over that flange. Now, Staber identifies his design drivers. At column 1, lines 30 to 31, in the summary of invention, he says that his design, quote, allows for one part, one part to be used for either side of the equipment rack, or in transition in either direction. If you want to go from left to right, or right to left. And to do that, how he does that is he makes it symmetrical. The top end is a mirror image of the bottom end, and he's got alternative mounting slots to flip it this way or that way at an acute angle. In the same sentence that I just cited, where he identifies his design drivers, he says, he emphasizes that it's to make the cable bridge as compact as possible. That's the second driver. If you look at his device, it's flush with that flange. Why? Because it would bump into equipment, if it wasn't flush. There's equipment in the rack. So let's go to what Staber doesn't disclose. The curved sidewalls. It's undisputed, and the board found, that Staber lacks the two curved sidewalls, but the board found that it would have been obvious to modify Staber to include the two curved sidewalls, the flared out sidewalls, from Schuerman, for example. Well, to resolve this issue, we need to understand the reason why the two curved sidewalls are included in the Schuerman design, for example. If you go to Schuerman, you can see that it's a trough, and it's inviting cables from either side. Inviting cables from either side, and so it's got a curve to the right to invite cables from that direction, and a curve to the left, to invite cables from either design. The Staber design drivers are fundamentally different. They've got this versatile device, one part for all applications, it's symmetrical at both ends, designed to take a single cable. And how does it do that? It aims it at an acute angle to invite that cable in, and by doing that, it can get it over without overbending, without the need for curves. Can I interrupt you just before your time runs out? Maybe I've got the issues mixed up, but it seems to me, in connection with your cross-appeal at least, there were two issues raised with respect to the first case, Claim 14, and the second case, Claim 1, and that has to do with the Board's conclusion with regard to intended use. Were you planning to cover that in your remarks? Yes, I'll cover it. Right now? Okay. The intended use language, our position is it's not intended use. We're not talking about language, for example, when the exit trough is mounted to the lateral trough, the cable exit pathway extends transversely over the top edge of the sidewall. Our position is not mere intended use. We're talking about language in the body of the claim. We're not talking about context in the preamble like a boat used for water. Specifically here, the claim language relates, and it impacts the mounting structure on the claimed exit trough, as well as the cable exit pathway surfaces, again, on the exit trough. Are you looking at 14 or 18? I'm at Claim 1, 625. Claim 1C of 625. What's that? Claim 1C of 625. It says when the exit trough is mounted to the lateral trough, the cable exit pathway is orientated so that it is extending over the top edge of the lateral trough sidewall, but not just at any angle. It's transversely to the lateral trough sidewall. How is this structured? You can't have just any mounting structure or cable exit pathway surfaces to accomplish this. It restricts, by reference to the lateral trough, it restricts what those structural elements can be. The office, they can speak for themselves obviously in a few minutes, but I think they say this goes to orientation, but not to structure. It seems to me that this does go to orientation, right? It goes to orientation with reference to the lateral trough, but it restricts the mounting structure and the cable exit pathway structures. There's a case we cite in our brief that talks about a chair sized to be fit within a car door opening, and that was found to be a structural limitation. This is just like that. But where in this where in clause, and where in usually speaks to result, but where in this where in clause is there structure that is not in the earlier portion of the claim? That's the issue, isn't it? I'm sorry? Whether it's structure depends upon whether there is structure that isn't already recited in the early parts of the claim. Am I right? Well, there is. Because if it's not additional structure, if it's just reciting result, then it is intended use rather than structure. I wouldn't agree with that because, like I said, you can't have just any mounting structure or any cable exit pathway to accomplish this, to accomplish this result. And so it does, just like the chair case, size to be fit within the car door opening, it does impact the structure. Let's not get off into what the case is where, as I asked, is there structure in the earlier part of the claim that would make, that this where in clause would duplicate and therefore make it intended use rather than structure. And if the structure's in the early part of the claim, you can't say that there's structure in the where in clause. Well, the structure recited in the earlier part of the claim, the cable exit pathway surfaces, for example, defined by in claim one as including... Why aren't you telling us it requires over instead of through the wall and that is structural? Well, it does require over and transversely over, and so that language tells you what the mounting, it puts a restriction on the mounting structure and the type of cable exit pathway surfaces that can be used. Does that answer your question? Somehow that didn't come to mind in your thinking though. I'm sorry. But I guess, why don't you be a little more explicit in terms of what you're saying. So the claim language under thesis extends transversely over the top edge. So you're saying that's the structure here? That's right. It's referring to the structure, I'm sorry, it's referring to the structure of the cable exit pathway structure defined by the surfaces that include a curved bottom wall, two curved sidewalls, and as well, a vertical downspout. And so it's with reference to that and it also restricts how it can be mounted. So you don't go through the sidewall. Well, you always say that at the beginning language in C, right? It's mountable to the lateral trough without cutting the top edge and corresponding upstanding sides. So you're saying add something to help mount it? Yes. What does it tell us? It tells us that you can't have cable exit pathway surfaces or mounting structure that takes you through the wall. You have to go in the opposite direction. And if you look at Staber, for example, we talked about his design... And you think in the absence of this language, the rest of the structural language and the claim would allow and include going through the wall? Yes, I think it's very important. Why is this not obvious to kind of return to something Judge Lurie observed earlier? You've got a trough, there's really only two ways out of the trough, right? Either over the edge or through the wall. Wouldn't anyone of knowledge in this area of art rather interchangeably use those two escape routes from the trough? No, not based on the art. We do have an art. We have Scheuermann going through the wall. We have Henneberger that seems to be coming up and out. We have Staber going over the flange, which is the wall in this case. We have him going over and through rather interchangeably. Why isn't this, let's start with, very clearly there in various references? Well, another way to say it with talking about the design drivers is that the Staber's reasons for adding curved sidewalls, for example, are undermined by Staber's design drivers. If you add curved sidewalls, for example, to Staber, you'll lose the symmetry. You'll lose that flexibility. Also, it serves no useful purpose. You're already aiming it to prevent over bending. To get a single cable across, there's no reason to curve it at that point. As well, it would conflict with that flange. If you put a curved sidewall, it'll bump into that flange. The court's principles announced in Depew, for example, are applicable here. It says, an inference of non-obvious is especially strong where the prior art's teaching undermined the very reason proffered as to why one aborted skill in the art would combine the known elements. The same applies to the vertical downspout. The vertical downspout, again, neither Schurman or Weyerhofer, the two secondary reference, even have a vertical downspout. That's what the court found because vertical means perpendicular to the plane of the horizon, yet they said it would be obvious to do it. Well, not if Staber says make it symmetrical, one part for all applications, and if you add a vertical downspout, you create other problems. Yes, it would run into the bottom of the trough wall. So, and incidentally, if you look at figure 3 of Staber, he lives by this rule. You notice that after he crosses over the flange, the cable takes a 90 degree turn, and he doesn't add anything in there. No curve, no vertical downspout. He lives by his design drivers. So, for this vertical downspout, we're talking about something that's not even in Weyerhofer and Schurman, and in conflicts with the design drivers. The principles, again, in the DePue case apply. One would be deterred based on the design drivers in Staber not to do this. And so that gets me to the language about... Do we apply deference to the board's conclusions or not? But there's no... What's the standards that we apply on these cases? Substantial evidence, but there is no evidence. They didn't come forward with anything from one of skill and the art. And what we have on our side is Staber's own works that establish design drivers that are in direct conflict with that combination. And the same applies to the mounting. When mounted, it extends not only... It extends over the top of the lateral cross sidewall, but not just at any angle. It extends transversely over the top. Again, you can't have just any cable exit pathway or surfaces to do that. And it gets me to the issue of what does transverse mean? Now the board, in another opinion that's on appeal, said transverse means across and it can't be at any angle. Well, that's just wrong because it gives no meaning to the word transverse. Anytime you go over the edge, you go... Extend over, you go across. Claim one contrasts with other claims that don't recite the word transverse. And if you go to the specification, the only embodiment shows the cable exit pathway extends at a perpendicular angle. Okay, transverse. That's the only reasonable definition. And if you go to Staber, they're saying just turn it in a transverse perpendicular direction. Again, to do that, you'd have to violate Staber's design drivers. You'd have to... Staber's about aiming it at an acute angle to prevent overbending. To prevent overbending, the bridge is aimed at an acute angle to transition that over. So, again, this third limitation, the third missing limitation is also not there. And, of course, if you turn it transverse and you're on a horizontal trough with those straight walls, they just stick out right into the cables. They block the cables. And that would also be a problem. So, conflicts with the design drivers and it's not operable. It's going to block the cables. So, where does that get us? Let's look here at all the changes that one skill in the art would have to make to go through to convert Staber to a claimed invention. You'd have to ignore that it's disclosed for use on a vertical flange and turn it horizontal. You'd have to change the two sidewalls and incorporate on one end and incorporate, for example, Schuerman's flared-out curved sidewalls. Next, you'd need to add a vertical downspout, which makes no sense in view of Staber's teaching. And then, you'd turn it transverse and perpendicular. So, we're talking about a lot of changes here. It's changes that conflict with the design drivers and create other problems. This is classic hindsight. This is classic hindsight to reconstruct the invention. They're using the problem that our invention explains as well as the solution in the patent and they're using that as a road map. So, that gets me to the upper surface in claim 14 of the 220 patent. You're into your rebuttal time, you realize. Okay. Rebuttal, I'm going to cross it here. Yeah. I'll make this point very brief. Claim 14 recites the upper surface. The board, in its opinion, never addressed it. Never addressed it. Upper surface is a recited element of the exit truck. It has to be given meaning. It makes no sense as Pandwood says to say it's just some surface. It has to be given meaning. And, it's confusing how we got here because to the board, we said it's a surface above the cables and they said, quote, it appears to be referred to as an upper surface because it is above the cables. So, we were on the same page. And, even the examiner in the original prosecution said at the appendix A3019, he understood what it was with reference to the upper surface that it was critical, protects the optical fibers from bending and just like Pandwood, understood that it referred to a surface for guiding cables. So, that's real world evidence of how someone familiar with this technology would construe it. So, if upper surface is properly construed to mean above the cables, it can't be disputed that neither Staver or Tuerman have that feature. Thank you. Okay, thank you. Any other questions at all? Please, the board. I think there are a few ways to simplify the approach to this case. And, that is to focus on the rejections that were actually put in place by the examiner or affirmed by the board which is resolved in 95% of the case for us. So, if we start with the first case involving the 220 patent, the primary rejections there turn around Staver and Anticipation. And, Staver teaches all of the elements found in those given, in those claims from the first patent. We don't need to reach a claim construction issue in Staver because under either definition, the sidewall of the trough or the flange that Staver refers to is not modified. So, that whole discussion of cutting and modifying and the pictures don't even need to be reached by this court. Staver, in a rather crass terms, just really looks different, doesn't it? Dealing with one claim rather than one wire taking it over a flange and a rack rather than out of a deep trough. Should we be bothered by that? I don't think the court should be bothered by it for purposes of anticipation in the first case or... Anticipation is going to require each and every, you know all that stuff, and there seems to be a lot of difference. Well, obviously, we're dealing with, as you said, getting the cables out of the trough and there are a couple of different ways to do it. Staver is a good base reference because the grid in Staver is curved and it goes up, it kind of levels off and then it goes down again. And that's one of the key features of the patents at issue for the court is I kind of think of the ABC patents as having a slide. So, one is certainly more of a grid shape and one is more of a slide shape. But one of the essential features is this up and over and down. And that's the key feature that Staver teaches. Now, if you want to include all of the various limitations that run across the 30 plus claims, yes, there are some adjustments to be made in terms of the different angles at which Staver can be turned and the vertical drop which is implied in almost all of the references by the downward curve that occurs in each and every one. So, Staver is a good base reference and the very few limitations that aren't directly encompassed by Staver are taught by Schuerman and that's the combination for the second case. How can then this upper surface limitation be just an intended use when you just told us how important it was and now you're just, and yet the board dismissed it as a use? Well, there are a couple different surfaces going on here. There's the surface of the actual bridge that the cable is passing over and then there's this one portion of one of the claims that talks about a different surface. Are we talking about claim 14 and 220? Yes, Your Honor. The last section of claim 14, pull it out here. In other words, you're not talking about claim 1C and 625? Yes, Your Honor. We're just talking about the last paragraph, the last phrase in claim 14 from the 220 patent and it goes on to talk in detail on and on about the shape of this exit trough and then finally at the very end of the claim it says, further comprising an upper surface which is completely undefined and then it says, and it was added during the amendment to the case and at least partially facing the bottom of the first trough when they're mounted together. So, yes, ADC has pointed to this very small upper surface above the cables and it says, well, this is important because it's above the cables and it's protecting them and it's doing various things but if you look at the claim language, even the amended claim language, it's just an undefined upper surface. So, the examiner and the board... Well, it says, and at least partially facing the bottom of the first trough. Right, right. So, what the examiner said was that if you look at your bridge, and here's the trough, they kind of go like that, that the bottom of the staver bridge is partially facing the bottom of the staver trough and that's enough for this very broad kind of undefined limitation. And the board also said, wait a minute, when you start talking about how these two pieces work together, and the lateral trough isn't even part of the claim, we're starting to get into an area of intended use and the board isn't even going to read that limitation in. So, if you read the limitation and the examiner found it, if you find that the limitation is going too far afield from the actual structure of the exit trough, then this one portion of the claim, the upper surface facing down, isn't something the court has to address here today. I'm a little concerned with the intended use findings in both the 220 and the 220. There are minimal structural limitations  pretty much confined our intended use concerns to preambles. So, I'm wondering why the board is extending intended use in the structural aspects of the body of the claim. I think the reason why intended use makes sense in this case is the same reason why it's typically dealt with in a preamble is that intended use is really trying to give the claims context and that's why it was brought up in the orthokinetic case which was a 112 decision to say, okay, how do we define what's being discussed here and then we're going to look at the context of what's happening in the claim and the preamble and the various parts. But when you just have a claim that's simply to the exitrop and not to the combination, then when you start to define the structure with how it looks when it's connected, then you're getting into trouble and that matters more obviously from an infringement perspective. If you're selling just the exitrop, as the chief judge pointed out earlier, talking about 625 claims, going over the top edge is structural, isn't it? As opposed to doing something else, whether it's obvious or not, is another question, but as a structure, isn't it a structural feature to go over the top edge? I think it's a structural    the 625, the 625 claim, your honor was suggesting earlier, that structure is captured by other parts of the claim. Which parts? When it says it leaves the cables, let's see, if we're looking at the 625 patent claim 1. Is it the second line that says terminating at a top edge? Yes, your honor, it's in this introductory language, and then it's also talking in part C. Which is also preamble. Yes, it is preamble, but in part C, where it says the cable exit trough is mountable to the lateral trough without cutting the cable, that's imparting the structure that's needed. Now, this issue of intended use you could say is on a spectrum. There is some reference to how this works in the real world, which makes sense in a part structure, but when you keep going farther and farther down that road, you're getting away from structure into the area of use which isn't imparting new limitations. And as I was saying, if you're dealing with an infringement context, if ABC was suing a party for infringement who was just making the exit trough and how it is or isn't connected to the lateral trough and the  trough,  getting away  structure into   use. And I think that's important to know because I think it's important to know that there are different ways that you can get away from structure that was totally defined by a claim not infringed if the saucer was very small as you sometimes see when you order your espresso in the cafe or a big saucer that you could put a bucket on the side of. It doesn't matter. What we're trying to  make sure that the standard of intended use is clear. And we're trying to make sure that the standard of intended use is clear. And the other thing is that the standard of intended use is clear. So in the first appeal, the 1435 appeal on A404, found that it taught the extending  after crossing the side wall. If you're going to say it's a part of new structure, that's the new structure. It's still, that trough is still heading up after it crosses the wall. And the examiner explicitly found that that's found in Staber on A404. Now in the second case, and that's claim 21, and the second case dealing with the 625 patent, you've got two issues about intended use. And that's  claim 1 and claim 11. Claim 1 is the routed upwardly, and that was found by the examiner as well on page A314 in the second appeal. And then you have the same limitation leading upwardly after crossing the side wall, and that's found on A332 by the examiner. So the office understands that the  is trying to find each and every limitation from an anticipation and obviousness perspective, and also appreciates the position of the board, which is that ADC has gone too far down the avenue of intended use, and we need to focus on the structure of what is actually claimed, and that's the exit trough. A moment ago, we were saying that the top edge recited in line 2 of the 625 claim 1 is the         first section of the patent office. And as Judge Lori indicated, the board are subject matter experts when it comes to the patentability of the claims. They don't address internal patent office procedural issues, and when Panduit received the action from the closing prosecution and saw that what is believed to be its claims, which if you look at how they presented them, were presented very briefly, were not properly considered, that was the point at which they needed to speak. They should not have essentially rolled the dice and said, all right, we're not going to say anything and we're going to hope that we can present these during the board appeal and have the board fully consider them at that point when the board didn't have anything to look to in the examiner's right of appeal notice to, you know, to  the rules and understand that there is a gap in the rules is when a patent holder amends a claim during reexamination. Under those circumstances the rules permit them to present new rejections and there's a whole set of  that the board has to follow. So I think the board was right to say these issues were not before it and focus on the issues that haven't properly presented. And if the court has no more questions I will conclude here.  you. Thank you so much. We turn to you, Mr. Collier, is that right? Okay. Thank you. I have two quick points. Claim 14 of the 2-2-0 patent. I want to make it clear the claim recites an upper surface to a particular orientation. This is shown on page 11 of our brief. What the board did is they just dealt with the orientation language and dismissed both parts, the upper surface, which is the limit on the exit trough and the orientation, dismissed it both as intended use. But because the upper surface is recited as an element of the exit trough, it has to be given meaning. It's a structural element. And the spec, the examiner in the original prosecution and Panduin didn't dispute it going up to it. They understood that it served a cable routing function. The second point I'd like to make relates to when mounted extends transversely. If you look at Staber, you can see that it does not meet this limitation by looking at the mounting structure. Angled slots, angled slots. My point here is that this illustrates that that wear-in clause and structure. It's part of the equation. You look at the mounting structure and the structural surfaces of the exit trough. You have to look at those. They have to cooperate with each other to meet the requirements. I'd like to first address the issue of whether or not the added claims were reviewable by the board. I'll briefly talk about the transverse issue. Both the patent office and ABC have taken the position that the board's failure to review the examiner's refusal to treat those challenges as a decision favorable to patentability. With respect to the transverse issue, ABC has taken the position that transverse means perpendicular. The broadest reasonable construction of transverse is across. Anything that goes across something is transverse. In state work, the cable bridge clearly goes across the flange. It is transverse to the flange. If they wanted to claim something that was perpendicular to the upstanding side of the chalk, they could have said perpendicular. In fact, other claims do say generally perpendicular. Transverse is a broader term. They clearly disclosed that a structure goes over and transverse to the wall. With respect to the upper surface limitation, it says specifically the exit trough assembly further comprising an upper surface positioned above and at least partially facing the first trough section. The exit trough assembly is mounted to the first trough section. It doesn't even recite an intended use of routing the cables. Nothing about this says that it involves the cables, that it's not a structural support. It doesn't say what it is. All it requires is some upper surface that faces the bottom of the trough. We don't even need to address the intended use issue. With respect to the other intended use limitations, even if this court disagrees that those are mere recitations of intended use, at most they simply recite capabilities of the structure of the exit trough. All of these prior references that we've addressed disclose these capabilities when they're attached to the hypothetical trough structure that's discussed in these plans. I'd like to briefly turn back to the Belkin case because the Belkin case  different than our situation here. What the appellant was asking for in the Belkin case was a specific trough structure that was  being requested for the appeal. So our situation is quite different. With   the record. Thank you very much. Our next case this morning is The Belkin case. The appeal case is a             Our next hearing is scheduled tomorrow. At 5.40 p.m. Our next hearing is scheduled tomorrow. At 5.40